KATE SPINDLE v. LUCIUS D. HYDE and WALTER E. HYDE, Appellants.

Division One, December 24, 1912.

1. DECREE: Not Responsive to Pleadings: Alleging Faudulent Sheriff's Sale: Invalid as Homestead. Where the petition charged that a sheriff's sale and deed of real estate to one brother belonging to another was fraudulent as contrivances between them to hinder and delay existing and subsequent

creditors, a decree setting them aside on the sole ground (not pleaded and not tried) that the judgment debtor had a homestead in the land and was not notified of his exemption privilege by the sheriff, is not responsive to the pleadings and cannot stand.

2. ———: ———: **Fraud Ex Maleficio Pleaded: Equitable Mortgage Decreed.** Where the bill charges that one brother fraudulently conveyed all his real estate to another, as trustee *ex maleficio*, to hold for him, in order that he might defeat and hinder his existing and subsequent creditors, a decree which in effect finds a valid mortgage arising out of an alleged contract between the two, and holds all the conveyances by the one to the other to be valid equitable mortgages, and, having stated an account, permits redemption from that mortgage by the grantee of the deeds, who had not asked to redeem, is not responsive to the pleadings. The bill sounds in tort and the decree in contract. The bill assails conveyances as fraudulent, and the decree affirms them as valid but construes them to constitute a blanket equitable mortgage.

3. ———: ———: **General Prayer.** The rule that under the general prayer for relief a party may have any relief to which he may show himself entitled, is limited to relief founded on and consistent with the facts set out in the bill, and not such as may be proven at the hearing.

4. ———: ———: **Quieting Title: Aided by Answer.** An answer to plaintiff's petition charging a fraudulent conveyance, which is in no sense a cross-petition or cross-bill containing averments entitling defendants to have title defined, determined and decreed under the statute to quiet title, cannot be invoked in aid of plaintiff's petition to the extent of authorizing a decree adjudging the conveyances to constitute a blanket equitable mortgage.

5. ———: ———: **Fraudulent Conveyances: Suit to Set Aside by Purchaser After Execution Sale.** The better course, since it tends to prevent a sacrifice of the property, is for the judgment creditor to go into equity in the first instance to set aside the conveyances complained of as fraudulent or to open them up to let in the lien of the judgment (following Welch v. Mann, 193 Mo. 1. c. 326); but he can also first cause execution to issue under his judgment and buy the property at execution sale, and then go into equity to have the prior conveyances set aside as a consummated fraud standing in the way of his title, but in doing so he must be held to prove the cause of action stated in his bill.

247 Mo.—3

Appeal from Chariton Circuit Court.—*Hon. John P. Butler,* Judge.

REVERSED AND REMANDED.

*J. A. Collet* and *W. M. Williams* for appellants.

(1) The decree is not founded upon the issues tendered by the petition and embraced within the pleadings. The suit is predicated upon the charge that the various conveyances by which Walter E. Hyde acquired the legal title were made to carry out a conspiracy to hinder, delay and defraud the creditors of his brother and co-defendant, Lucius D. Hyde, and that the land was to be fraudulently held in secret trust for said Lucius D. Hyde, a party to said conspiracy. The decree is based upon the ground that Walter E. Hyde was an equitable mortgagee and his brother entitled to redeem the land, and that plaintiff succeeded to this right by her purchase at the sheriff's sale. A decree in equity must be founded upon facts embraced within the pleadings. Dallam v. Renshaw, 26 Mo. 543; Needles v. Ford, 167 Mo. 495; Schnider v. Patton, 175 Mo. 684; St. Louis v. Contracting Co., 210 Mo. 491; Newton v. Kenton, 79 Mo. 382. (2) The land in controversy was conveyed to Walter E. Hyde, and he became the owner thereof, long prior to the marriage of the plaintiff to Lucius D. Hyde, and before any such marriage was contemplated or thought of, so far as is shown by this record. Not one of the existing creditors at the time of the conveyances is complaining and a subsequent creditor cannot succeed on the ground of fraud without showing that the transfers were made to hinder and delay future creditors. Krueger v. Vorhauer, 164 Mo. 156; Pane v. Stanton, 59 Mo. 158; Grocery Co. v. Smith, 74 Mo. App. 419; Loehr v. Murphy, 45 Mo. App. 519. (3) The decree was erroneous in declaring Walter E. Hyde an equitable mortgagee of the land, and in stat-

ing an account with him on that theory: (a) The petition did not allege any such relationship and made no charge in regard to the receipts and expenditures, and no issue was tendered upon that subject. Needles v. Ford, 167 Mo. 512. (b) The testimony concerning an agreement to permit a redemption of the land was in effect, that within two years after the first sale, which was under the Ehrhardt judgment, at the suggestion of the sister of the defendants, it was agreed that Lucius D. Hyde might redeem the land by paying all the expenditures, and a writing to that effect was signed. This was after the land had been sold under the Erhardt judgment. A mere promise to permit the owner of land, after it has been sold under a valid lien, to redeem, cannot be enforced in equity. Mansur v. Willard, 57 Mo. 347; Price's Heirs v. Evans, 26 Mo. 30. (c) The fact that the agreement was reduced to writing will not give it validity, if it was not founded upon a sufficient consideration. Taylor v. Von Schrader, 107 Mo. 206; Tucker v. Bartle, 86 Mo. 114. (d) Before such a contract can be enforced, its terms must be established by clear and satisfactory evidence, and not be based upon mere loose declarations or statements. Mansur v. Willard, 57 Mo. 347. (e) There was such laches as will prevent a redemption under the circumstances of this case. Ferguson v. Sodam, 111 Mo. 208.

*H. J. West* for respondent.

(1) The two conveyances made to Walter E. Hyde in February, 1895, were fraudulent and void as against creditors. The deeds were absolute in form, but intended only as security for $760 borrowed from the Farmer's Bank on their joint notes. The land was worth $2400. The fact that the deeds were intended only as security was kept secret between the parties; and the grantor continued to exercise much

authority and many acts of ownership over the land. The following badges of fraud are all found in these transactions: False statement of consideration, inadequacy of consideration, retention of possession and continued exercise of control over the land by the grantor, and deeds absolute in form, but intended only as security, and this fact kept secret between the parties. Bump on Fraudulent Conveyances (4 Ed.), Secs. 45-67; 14 Ency. Law, 361 and 516-525; Farwell v. Meyer, 67 Mo. App. 566; Albert v. Van Frank, 87 Mo. App. 571; Gentry v. Field, 143 Mo. 399. (2) The purchase by Walter E. Hyde at the sale under the Ehrhardt execution was fraudulent and void as against creditors. This purchase follows closely upon the heels of the two conveyances in February, 1895, and was actuated by the same motives and bears the same marks of fraud. (3) The fact that this purchase was made at a public sale under a valid execution does not relieve it of its fraudulent character. Dallam v. Renshaw, 26 Mo. 533; Woodward v. Mastin, 106 Mo. 324; Miller v. Leeper, 120 Mo. 478. (4) Irrespective of the secret trust and the contract to reconvey, the conveyances complained of are fraudulent and void as against both existing and subsequent creditors. Sec. 2881, R. S. 1909; Pawecy v. Vogel, 42 Mo. 302; Payne v. Stanton, 59 Mo. 160; Bracken v. Milner, 99 Mo. App. 187; Cole v. Cole, 231 Mo. 236; R. S. 1909, Sec. 2881. A voluntary conveyance is not fraudulent *per se* as to subsequent creditors, but where there is actual fraud, as in the case at bar, the conveyance is void even as to subsequent creditors. Cole v. Cole, 131 Mo. 260; Bracken v. Miller, 99 Mo. App. 187. (5) The sheriff's deeds made under the Ehrhardt and the Wilding and Scrivenor judgments and executions were void because no homestead was set out to the execution defendant. Macke v. Byrd, 131 Mo. 682; Brewing Assn. v. Howard, 150 Mo. 445; Creech v. Childers, 156 Mo. 338; Smith v. Thompson, 169 Mo.

561; Kessner v. Phillips, 189 Mo. 515. (6) By means of the conveyances complained of in the petition the defendant, Walter E. Hyde, acquired title to the land in controversy to the use of his brother Lucius D. Hyde, and the interest of Lucius D. Hyde therein was subject to sale under execution. R. S. 1909, Secs. 2192 and 2880; McIlvaine v. Smith, 42 Mo. 45; Lackland v. Garesche, 56 Mo. 267; Lackland v. Smith, 5 Mo. App. 153; Bank v. Lime Co., 43 Mo. App. 561; Mfg. Co. v. Steel, 36 Mo. App. 496; Roberts v. Barnes, 127 Mo. 405; Bank v. Powers, 134 Mo. 432; Johnson v. Christie, 79 Mo. App. 46; Bump on Fraudulent Conveyances, secs. 191, 194, 298, and 592; 14 Ency. Law, 263. (7) The title acquired by Walter E. Hyde to the swamp land from the county and to the other land at the foreclosure of the deed of trust was acquired under a contract, whereby he agreed to advance certain money, and, when reimbursed out of the rents, profits and sales of the land, to reconvey the remainder of the land to Lucius D. Hyde. This constituted him a trustee for the use of Lucius D. Hyde, or an equitable mortgagee. Wilson v. Dumrite, 21 Mo. 325; O'Neill v. Capelle, 62 Mo. 202; Hargadine v. Henderson, 97 Mo. 375; Book v. Beasly, 138 Mo. 455. (8) The destruction of that contract by Bettie could not affect rights acquired under it. Neither could any change of mind on the part of Walter E. Hyde affect such rights. "Once a mortgage always a mortgage." Wilson v. Dumrite, 21 Mo. 325; Reilly v. Cullen, 159 Mo. 322. (9) The contract to reconvey was supported by ample consideration. The consideration is found in the relation of the parties. It is found in the fact that the titles were acquired by Walter E. Hyde at grossly inadequate prices. It is found in the fact that the swamp lands were paid for with the proceeds of other lands conveyed to other parties, the money of Lucius D. Hyde. It is found in the fact that the title acquired by Walter E. Hyde under the Ehrhardt exe-

cution sale was void because no homestead was set out to the execution defendant, and that the only legal title ever acquired by him to any of the land except the 160 conveyed to him in February, 1895, as security for a debt, was after this contract was made, and while it was in force and recognized as binding by all the parties. This contract was made by Walter E. Hyde to protect his brother. They thought it was sufficient to protect him then, and we agree with them. If it was sufficient then it is sufficient now. Its validity is not changed by the changed relations and interests of the parties, however much they may desire it. Neither do we understand that under the law of this State it is or ever was necessary that a writing declaring a trust should be supported by a consideration. Trusts are peculiarly free from conditions of this kind. Bispham's Equity (7 Ed.), Sec. 65. Measured by the standard here fixed, the written agreement executed by the defendants and given into the keeping of Bettie, meets all the requirements of the law, and fixed in Lucius an interest in the lands, which is now vested in the plaintiff. Lane v. Ewing, 31 Mo. 75; Leeper v. Taylor, 111 Mo. 324; Mullock v. Mullock, 156 Mo. 431; Leahey v. Witte, 123 Mo. 207; Richardson v. Champion, 143 Mo. 538.

LAMM, J.—Plaintiff, for three weeks the wife of Lucius D. Hyde and residing with him during that time in Chariton county, where he lived, then sued him in the Jackson Circuit Court for divorce. The relief she obtained in that suit was threefold, viz.: first, a judgment in January, 1903, for $5250 alimony; second, the restoration of her maiden name; and, third, the marital bonds binding her to Lucius were cut in twain.

Subsequently, in February, 1904, having sued out execution and caused certain real estate in Chariton county to be levied on as his property, it was struck

off to her under the hammer at sheriff's sale and she received a sheriff's deed. Presently, she brought this suit against him and his brother, Walter E. Hyde, the object and general nature of which was to set aside certain recorded conveyances purporting to transfer the land to Walter, which said conveyances are said to have been made in fraud of her right as a subsequent creditor.

From a decree in her favor, but subjecting the land to a lien in favor of Walter in the sum of $1250, defendants appeal. Plaintiff set out to appeal also, but abandoned it and rests content with her decree.

There is a main question duly raised below and stoutly pressed here, viz: Is the decree responsive to the pleadings and issues in the cause? That question seeks an analytical examination of the pleadings and decree with precision and particularity. As the question lies at the threshold, let us attend to it in its logical order.

The cause was tried on an amended bill, full and rich in averment of detail and (as presently seen) leaving no room for cavil or wabble on the theory of the pleader. Summarized, its averments follow:

After describing certain real estate, aggregating 445 acres, it avers that Lucius on October 22, 1894 (nearly ten years before the matrimonial venture of Lucius and Miss Spindle), owned it in fee simple and was in possession; that it was then subject to a deed of trust conveying it to one Rouse, trustee for the Connecticut Mutual Life Insurance Company, executed by him in January, 1894, to secure $4500 of borrowed money. (This deed of trust is not assailed.) After describing eighty acres (a different tract) the bill next avers that at the same time Lucius owned the tract in fee simple and was in possession thereof subject, however, to a vendor's lien in favor of Chariton county for about seventy-five dollars. (This tract for convenience will be called "swamp land.") That in Octo-

ber, 1894, one Ehrhardt recovered judgment against Lucius in the Chariton Circuit Court for the sum of $427.89; that at that time Lucius was greatly in debt, and, while he owned some other property of small value, he had only property enough (if honestly applied) to pay his debts—one other item of several thousand dollars indebtedness, due Wilding and Scrivenor, is set forth; that Wilding and Scrivenor, with other creditors, were pressing for payment of their claims and threatening suit; that Walter was acquainted with the financial condition of Lucius and knew he was being pressed for payment by his creditors. At this point the bill may as well speak sweepingly for itself, thus:

"That the defendants, well knowing all of the facts aforesaid, and in order to cheat and defraud and hinder and delay the existing and subsequent creditors of Lucius D. Hyde, and especially said Wilding and Scrivenor, out of their just claims and demands against him, fraudulently designed and conspired together at the time of the rendition of said judgment and subsequently to put the apparent title to all of said lands beyond the reach of said creditors; and in order to accomplish such design and conspiracy, they agreed to put the apparent title to all of said lands in the name of Walter E. Hyde, with the understanding that he was to hold said title in secret trust for the use of Lucius D. Hyde, Walter E. Hyde to advance whatever money was necessary to make such change in the apparent ownership. and to reimburse himself out of said lands for such moneys as he might so expend."

In order that the understanding of the chancellor might be informed and his conscience be awakened by full information to that end and that a schedule of particulars, the steps taken to consummate the alleged fraudulent conspiracy and covinous contrivance aforesaid, might be blazoned forth, the bill goes on to

set forth such bill of particulars. Before each item thereof is an earmarking allegation to the effect that the thing about to be complained of was done ''in pursuance of said fraudulent design and conspiracy,'' or ''in further pursuance of said fraudulent design and conspiracy.'' After each item are such characterizing averments as this, viz: That the act so pleaded as a specification, a fraudulent step, was ''solely in furtherance of the fraudulent design and conspiracy aforesaid.''

The first act, so characterized, is that in February, 1895, Lucius conveyed to Walter the swamp land by a warranty deed without consideration, but with a falsely recited consideration of $1000.

The next step in the alleged fraud is that a few days thereafter, in the same month, he conveyed by a like deed to Walter eighty acres of the land first referred to in the bill, and that this conveyance was without consideration, but under a falsely recited one of $2000.

The next fraudulent step is that Lucius failed to pay the Ehrhardt judgment and '' by a failure to pay the same, caused and permitted an execution to be issued.'' That the sheriff levied it upon all the land except the two eighty-acre tracts theretofore conveyed to Walter and, at the regular April term of the Chariton Circuit Court, sold it under that execution. That at that sale Walter was the purchaser at an inadequate consideration of $488, and received a sheriff's deed. That Lucius permitted such pretended sale not only to put the apparent title in Walter but in order to cheat and defraud and hinder and delay his creditors.

The next act of fraud is said to be that Lucius refused to pay the vendor's lien held by Chariton county on the swamp land and thereby ''caused and permitted'' the county to institute suit in 1897 to enforce the lien; that the lien was enforced and the swamp land, sold under the judgment, was purchased

by Walter who received a sheriff's deed; that in that sale Walter was acting for Lucius; that the deed recited a $600 consideration, but in truth nothing was paid except enough to satisfy the lien.

The next fraudulent step is said to be that Walter procured a patent to issue from the county in his own name as assignee of Lucius to the swamp land.

The next fraudulent step is said to be that in 1899 Lucius failed and refused to pay the Connecticut Mutual Life Insurance Company debt and thereby "caused and procured" the deed of trust to be foreclosed. That at such foreclosure sale Walter became the purchaser and received a trustee's deed expressing a consideration of $5500; that he did not buy the land for himself, but for Lucius, and actually paid only the principal debt with a small amount of accrued interest. That he then borrowed $4500 from another Insurance Company (The Prudential) evidenced by his note and secured by a deed of trust on the land—this to obtain the money to pay off the principal of the former debt.

The next fraudulent step is said to be this: In June, 1895, said Wilding and Scrivenor, having obtained judgment against Lucius for $4357.44, caused an execution to issue and to be levied on part of the land in question (the description covering about 400 acres); that thereafter a sale was made under that levy and Wilding and Scrivenor purchased for $415 and received a sheriff's deed in December, 1895. That after plaintiff had obtained her judgment against Lucius in 1903 and was threatening to have the land sold thereunder, Walter in order to cheat and defraud her, procured a deed from Wilding and Scrivenor purporting to convey to him the land acquired by them under that sheriff's deed, for the inadequate consideration of $250.

It is next averred that in February, 1903, by the consent of Lucius, Walter conveyed to one McMahill

260 acres of the land for $6990.30, which purchase price
he used to pay off the 'deed of trust he put upon the
land to the Prudential Insurance Company, and to
reimburse himself for moneys expended on account of
the land. (There is no direct averment of fraud in,
nor is there any attack made upon, the McMahill sale,
nor is McMahill a party.)

In connection with these several steps taken to
consummate the original fraudulent conspiracy (all
of which, as said, are characterized as in pursuance
thereof and to effectuate, fortify and consummate the
same) there are allegations scattered through the bill
connected with each item or step of the fraud, mean-
ing that (by reason of the facts pleaded) the land is
held in secret trust by Walter for Lucius and to place
his property beyond the reach of his creditors in order
to cheat, defraud and hinder and delay them, whether
existing or subsequent.

Finally it is averred, in effect, that Lucius at all
times referred to was insolvent and owned no prop-
erty whatever in his own name, and that plaintiff,
having obtained judgment as aforesaid, caused an ex-
ecution to issue and be levied upon 235 acres of the
land, describing it, and a sale to be made in February,
1904, at which she bid $100 and obtained a sheriff's
deed therefor. Averments (indicia of fraud) are next
made to the effect that Lucius had been in possession
of parts of said land and in control of the whole of it,
except the McMahill part, and has been collecting the
rents without accounting to Walter; that Walter has
been in possession of part of the land and has paid
taxes thereon, made improvements, paid off incum-
brances and has kept an account of his receipts and
has been fully reimbursed. Finally, the bill winds up
in this fashion:

"That each and every apparent title to said lands
or any part of said lands acquired by the defendant
Walter E. Hyde, has been acquired by him in order to

assist and enable his codefendant, Lucius D. Hyde, to place his property beyond the reach of his said creditors in order to cheat and defraud and hinder and delay said creditors, both existing and subsequent, out of their just claims and demands against him, and he has held and is now holding such apparent title in secret trust for the use of Lucius D. Hyde.

"Wherefore, by reason of all the foregoing facts, plaintiff prays the court to find by its judgment and decree that plaintiff is the sole and absolute owner in fee simple of all the lands included in said deed from the sheriff of Chariton county, Missouri, to this plaintiff, dated the 5th day of February, 1904, and recorded in the recorder's office of Chariton county, Missouri, in book 80, at page 395, and that the various deeds hereinbefore mentioned purporting to convey to Walter E. Hyde title to said lands or any part of said lands be held to have been accepted by him in pursuance of a design and conspiracy between himself and Lucius D. Hyde to cheat and defraud and hinder and delay the creditors of said Lucius D. Hyde out of their just claims and demands against him, and that the apparent title so held by said Walter E. Hyde was and is held by him in secret trust for the use of Lucius D. Hyde, and that plaintiff's title to said lands so claimed by her be quieted as against the claims of the defendants and each of them, and that the defendants and each of them be forever barred and precluded from asserting or claiming any title, estate, or interest whatever in or to said lands or any part thereof. Plaintiff further prays judgment for the possession of said lands, and for such further orders, judgments and decrees as may to the court seem just and proper."

Briefly put, the answer tendered an issue on the alleged fraud, and alleged in turn that Walter's several purchases (which were admitted) were without intent of wronging any person, and that he is now,

as at all times he has been, holding the land in his own right. There was a prayer that title be quieted in Walter.

With the pleadings in that fix, let us look to the decree. It, in substance, was that the sheriff's sale under the Ehrhardt judgment was void and that the sheriff's deed to Walter passed no title because at that time Lucius was entitled to a homestead and the sheriff failed to set off one to him; that soon after the Ehrhardt sale the two Hydes entered into a contract whereby Walter was to have possession and control of the land, pay taxes and make improvements thereon, rent it out, collect rents, sell part of it, and, after he had been reimbursed for his outlays, or whenever Lucius should pay him a sufficient sum to reimburse him, he, Walter, was to convey the remaining part back to Lucius; that the several conveyances to Walter (whether by sheriff's deeds, trustee's deed or conveyances directly between the brothers) and all purchases by Walter were made while in control of the land under the foregoing contract; that his title thus acquired is held under the terms, conditions and trusts of that contract; that there was due Walter under the contract $1250 and that Walter acquired and held title as trustee or "equitable mortgagee," holding said lands until he be fully reimbursed; that Lucius was "equitable mortgagor" and had an interest in the land with the right to redeem; that said right of redemption had passed under plaintiff's sheriff's sale and deed to her in 1904; that by virtue of that sale she now owns the land subject to the payment to Walter of $1250; that the value of the monthly rents and profits were twenty dollars; that Walter recover judgment against the land for said $1250 (the same to be a first lien and to be paid by plaintiff within sixty days after judgment or within sixty days after it was affirmed on appeal here); that, if not paid, special execution issue in Walter's favor; and, that, upon such

payment, a writ of possession issue in Miss Spindle's favor.

It is on such pleadings and such decree that the question is sprung: Can the decree stand as responsive to the pleadings?

In determining that question, it is not at all necessary to set forth all the record facts on the merits, nor to comment on them. Of any such facts as are helpful in determining the question, we shall take notice in their place. We are of opinion that the decree must be reversed because it is not responsive to the issues framed by the pleadings. This, because:

(a) In the first place the decree swept away the efficacy of the sheriff's sale and deed under the Ehrhardt judgment on a ground wholly outside the issues. The issue tendered by plaintiff and accepted by defendants in that particular was whether or not that sale and deed were fraudulent as contrivances to hinder and delay existing and subsequent creditors of Lucius D. Hyde. That was an issue within the scope and purview of our statute leveled against fraudulent conveyances. [R. S. 1909, Sec. 2881.] Now, the court did not determine that issue, but (plowing around it and finding neither way on the issue of fraud) held that the sale and deed were void—why? Because of a wrong suffered by Lucius D. Hyde, to-wit, a failure of the sheriff to set off a homestead to him. Plaintiff tendered no such issue as that, defendant accepted no such issue as that, and the only basis for the decree in that particular is that the naked fact was admitted at the trial that no homestead was set off to Lucius D. Hyde. If an issue of that sort had been raised by the pleadings, in threshing it out, *nisi*, questions would arise for determination of this sort: Whether the Ehrhardt judgment was for an indebtedness that antedated the acquisition of a homestead by Hyde; whether at that precise time Hyde was the head of a family and entitled to a homestead; whether the

homestead privilege could, under any circumstances, be waived by the debtor; whether, if so waived, it could be asserted years afterwards (not by him, but) by a subsequent creditor in avoidance of the sale; and (there being some evidence that Walter bought at that sale at the request of Lucius) whether, in that event, even Lucius would not be estopped to assert a homestead right as against Walter? This record is dark on all such questions and silent on all facts on which they could be ruled with safety.

Furthermore, the whole decree is built up around the proposition that shortly after the Ehrhardt sale the two brothers entered into a contract dealing directly with that sale and which subsequently, by its own virtue, drew within its terms and intendments other conveyances and sales made long afterwards. With the fabric of the decree built up on the foundation of that sale and such contract, another question springs, to-wit: Is not the decree inconsistent in voiding the sale in one breath and in the next treating it as valid and as the basis of a valid contract? We think so. The same decree should not knit and unravel, or loose and bind, the same thing at the same time.

By stating some of the questions that might arise if the issue had been tendered that the sale was void because of the failure to set off a homestead to Lucius D. Hyde, we have no purpose of determining those issues at this time; for they are not in this case, we suggest them merely to outline the possible situation and the problem confronting the court for solution had such issue been tendered.

In Studybaker v. Cofield, 159 Mo. l. c. 615, decided when the writer was at the bar, it fell to his lot to argue in this court (as a ground for setting aside a deed) that an old man *in extremis* was defrauded into making a voluntary conveyance by being assured by the grantee that his favorite nephew and heir expect-

ant was dead. Evidence to .that effect had been put in at the trial. The answer of this court to that contention was this (*inter alia*): "The evidence, however, was irrelevant, because there was no issue of that kind tendered in the petition."

In Black v. Early, 208 Mo. l. c. 313, in disposing of a part of a decree which held a certain tax levy void, a ruling was made, apposite here, to-wit:

"Furthermore, plaintiffs were not defending against the tax of 1905 on the grounds assigned by the court for invalidating it. It is a wise rule of law that the judgment of a court must be responsive to the pleadings; otherwise, the door is open wide for findings and decrees not based on the pleadings and not within them, thus leading to uncertainty and confusion and permitting cases to pass off on theories not threshed out at the trial and not within the pleadings of the evidence. The decree of the learned chancellor was, therefore, erroneous on this ground as well. [Roden v. Helm, 192 Mo. l. c. 93-4; Schneider v. Patton, 175 Mo. l. c. 723; Irwin v. Chiles, 28 Mo. l. c. 578; Newham v. Kenton, 79 Mo. l. c. 385; Reed v. Bott, 100 Mo. l. c. 67. See also, Kilpatrick v. Wiley, 197 Mo. l. c. 162, *et seq.*]"

(b)   It will be observed that the case stated in the bill was one of fraud alone. Fraud was the key that was to unlock the door and open up and avoid conveyances, patents, sheriff's sales on execution, sheriff's sales on vendor's liens, a trustee's sale and a trustee's deed; and defendants were summoned into court (and, when in, were challenged) to meet that charge and none other. By the bill Walter Hyde was a trustee, to be sure, but a trustee *ex maleficio*. The alleged fraud was earmarked and exploited in many alleged ramifications and vermiculations. In fine, the bill reeks with fraud, *passim,* the pleader impliedly stating that he had no case except one based on such actual fraud as would avoid a series of deeds, acts and

transactions running through years—this, too, on be-
half of a subsequent creditor. Now the decree says
not one word about fraud. Critically speaking, it is
tantamount to an inferential finding against the exis-
tence of fraud. *Contra,* in effect it finds a valid mort-
gage arising out of an alleged contract between the
two Hydes. It holds no conveyance void except the
sheriff's deed on the heels of the Ehrhardt sale. It
proceeds on the assumption that all the other con-
veyances to Walter are, in effect, valid mortgages in
equity and are all to be summed up as, and woven
into the seamless web of, a blanket equitable mort-
gage, and, having stated an account, it permits re-
demption from that mortgage. There could not well be
a more radical departure from the issues tendered. The
one (the bill) sounded in tort, the other (the decree)
in contract. The one assailed conveyances as fraudu-
lent, the other affirmed them as valid but construes
them to constitute a blanket equitable mortgage. It
is plain that if the pleader had counted on the theory
that Walter Hyde held an equitable mortgage arising
out of a contract, and that plaintiff was entitled to re-
deem from that mortgage because she had purchased
the equity of redemption at sheriff's sale, the issues
in such a case would have been entirely different than
those in the case tried. Those differences suggest
themselves spontaneously and need not be noticed
here.

It may not be amiss to briefly state that when a
woman was on the stand, a sister of the two Hydes,
it cropped out in her testimony in a rambling way that
shortly after the Ehrhardt sale a third brother, a min-
ister, came to Chariton county on a visit. At that
time, either because of her solicitation or at the in-
stance of the ministerial brother, the latter drew up a
paper writing which was signed by Walter and Lucius
and left with her. The birth of this writing was long

before any of the other deeds or transactions referred to in the bill. Walter agreed thereby, so she said, that on the repayment to him of his outlay he would sell or convey the land back to Lucius. On the face of things this contract *seemed* to relate only to the purchase under the Ehrhardt sale. The terms of the contract were not developed beyond the vaguest outlines. There was no inquiry sufficient to determine whether it was based on a valid consideration. Whether it was then newly thought of or was but putting in writing a former verbal agreement, we do not know. Whether at that time it was contemplated that further sales and conveyances should be made, or were likely, and that the contract was flexible and elastic enough to open itself up and cover those sales or conveyances, we do not know; and the parties litigant, having their minds fixed on the subject of fraud, did not take the pains to develop the matter in that regard. Was it an option to rebuy? We do not know. Was it a conditional contract of sale with time of its essence? We do not know. This evidence crept into the case on the issue of fraud or no fraud and, so far as we can see, it was the only office it was intended to fill. It certainly was not directed to an issue of mortgage or no mortgage. Finally, there also crept into the case on behalf of plaintiff an account which Walter Hyde is said to have kept with this land. This evidence was also put in on the issue of fraud. Whether it is a full account or is susceptible of explanation from the standpoint of a mortgagor and mortgagee is not disclosed. Based on such evidence, without any issue tendered on the terms, validity and scope of that contract and without testimony sufficient to base a decree upon, if such issues had been tendered, the decree in question fell from the chancellor—all this without any amendment to the pleadings or offer to amend. It seems that at a certain time Lucius contracted a third matrimonial alliance, at which event the sister, having

the custody of the contract, in a fit of anger or dis-
gust destroyed it.  This was her feminine way of in-
dicating her disapproval,, she herself being single,
of some age and unmarried, of her brother's attempt
to draw prizes, one after another, in what she evi-
dently eyed askance as a matrimonial lottery.

The question whether an amendment to this bill,
of such character as would permit the issue of mort-
gage or no mortgage to be tried instead of the issue
of fraud or no fraud, would be a departure, is a ques-
tion which must be left to the determination of the
circuit court when plaintiff offers such amended bill,
if ever she does.

As a new trial generally must be awarded, it
would be unseemly for us to put the chancellor in lead-
ing strings on the question of fraud if plaintiff elect
to stand by her present bill.  In the exercise of appel-
late jurisdiction we ought not to pass on that question,
until the trial court has first done so.  There is more
than one anxious question to solve, and more than
one legal proposition for him to apply in that regard
before he can hold all the conveyances, complained of,
fraudulent.

On her bill as it now stands, we hold the decree
is not responsive to the issues.  It went into an un-
defined *limbo* outside the pleadings for its substance.

That evidence, without a proper issue framed, or
outside the issues, will not support a judgment on ap-
peal, that a judgment must respond to the vital is-
sues tendered by the pleadings, that a prayer in a bill
of equity for general relief will not permit relief not
consistent with the pleadings and fairly within their
scope, is a favored doctrine of this court to which it
has consistently and persistently held—a doctrine
grounded in sound philosophy and standing every
test of reason.  "It is a great misapprehension to
suppose that one cause of action can be stated in a bill
in equity, and by some sort of comprehensive flexi-

bility of chancery jurisdiction relief can be adminis-
tered growing out of a state of facts not embraced
within the facts pleaded.    The rule that under the
general prayer for relief a party may have any relief
to which he may show himself entitled, is limited to
relief founded on and consistent with the facts set out
in the bill, and not such as may be proven at the hear-
ing." [Newham v. Kenton, 79 Mo. 1. c. 385.] In fact,
a judgment is but the conclusion in a syllogism hav-
ing for its major and minor premises the issues raised
by the pleadings and the proofs thereon.    A judgment
is the sentence of the law upon the record.    Now, what
is the *record* save the issues raised by the pleadings
and the evidence on such issues (*allegata et probata*)
—the one responsive to the other?

Early and late the doctrine formulated in the
Newham case has been the unbending rule in this jur-
isdiction.    [NcNair v. Biddle, 8 Mo. 257; Mead v. Knox,
12 Mo. 287; Harris v. Railroad, 37 Mo. 307; Needles
v. Ford, 167 Mo. 1. c. 512; Black v. Early, 208 Mo.
supra, and cases cited; State ex rel. v. Muench, 217
Mo. 124.]

If the bill had been incomplete or ambiguous, and
both parties had put a certain construction upon it
and put in proof on that theory, we would have had
a different case to deal with.    [Bragg v. Railroad,
192 Mo. 1. c. 358.]

(c)    The answer is in no sense a cross petition
or crossbill that would entitle defendants to have title
defined, determined and decreed under Sec. 2535, R.
S. 1909.    (Formerly, Sec. 650.)    It makes no aver-
ments essential to jurisdiction under that section and
can not be invoked in aid of plaintiff's bill.

(d)    Plaintiff did not go into equity in the first
instance to set aside the conveyances complained of
as fraudulent, and said to be in the way of collecting
her judgment, or to open them up to let the lien of
her judgment in, as she might have done.    That would

have been the better way; for it would have tended to prevent a sacrifice of the property. [Welch v. Mann, 193 Mo. l. c. 326, *et seq.*] She first bought and then went into equity to clear up her title on the theory that a consummated fraud stood in its way. She was entitled to take that course, if she so chose, but in doing so she must be held to prove the cause of action stated in her bill or on some proper amended bill. Under the terms of the decree appealed from she did neither.

Plaintiff complains of defendant's abstract, but the complaints are without merit in the present condition of the record as amended.

The decree is reversed and the cause remanded to be tried in accordance with this opinion.

All concur.